IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 28, 2012

## STATE OF TENNESSEE v. GWENDOLYN HAGERMAN

**Appeal from the Criminal Court for Sullivan County**
**No. S57,179    Robert H. Montgomery, Jr., Judge**

---

**No. E2011-00233-CCA-R3-CD - Filed June 4, 2013**

---

The Defendant, Gwendolyn Hagerman, was found guilty by a Sullivan County Criminal Court jury of five counts of rape of a child. <u>See</u> T.C.A. § 39-13-522 (1997). She was sentenced as a Range I offender to twenty years for each conviction, to be served at 100% as a child rapist. The trial court ordered partial consecutive sentencing, for an effective sixty-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support the convictions; (2) there was a material variance between the presentment, the bill of particulars, the election of offenses, and the proof; (3) the trial court erred in denying her motion to dismiss the charges due to pre-accusation delay; (4) the trial court erred in declining to conduct an *in camera* review of Department of Children's Services records; and (5) the trial court erred in imposing consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Stephen M. Wallace, District Public Defender (on appeal); Leslie S. Hale, Assistant District Public Defender (on appeal); Steve McEwen, Mountain City, Tennessee (on appeal); and Frank L. Slaughter, Jr., Bristol, Tennessee (at trial) for the appellant, Gwendolyn Hagerman.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Barry Staubus, District Attorney General; and Amber Massengill, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the sexual abuse of a minor victim, who was the daughter of the Defendant's then-girlfriend. Tina Reynolds testified that she thought she met the Defendant in December 2007. She recalled a telephone call in which the Defendant called Ms. Reynolds by the victim's name, who the Defendant claimed was her ex-girlfriend. She said the Defendant stated that the victim was pregnant. She said she and the Defendant went to Gatlinburg for New Year's Eve 2007. She said that she and the Defendant had a friendship and that they were sexually intimate once. She said their friendship lasted until May 2008. She said that she stayed at the Defendant's house frequently during this time and that the Defendant lived alone. She said that the Defendant used the names "Gwen" and "Cohen"[1] and that she referred to the Defendant as her "sugar momma" because the Defendant bought her gifts. She said the Defendant told her that Cohen was the name the victim called the Defendant. She said the Defendant dressed like a man in jeans, boots, and button-up shirts and drove a red Mustang. She said the Defendant had a tattoo on her leg and thought the Defendant had a tattoo on her arm. She said one tattoo depicted a broken heart and the other depicted a flower. One of the tattoos had two initials, representing the Defendant's and the victim's initials. She said the victim's initial was the victim's middle name in order to keep anyone from discovering the relationship. She thought the tattoo on the Defendant's leg had the initials. She said the Defendant told her the broken heart symbolized that the victim broke the Defendant's heart. She did not know if the victim had a tattoo. She said that the Defendant referred to the victim as "Baby Girl" and that the victim was younger. She said the Defendant claimed the relationship with the victim lasted two years.

Ms. Reynolds testified that the Defendant claimed to have taken the victim's virginity using a dildo. She said the Defendant stated that she used the smallest size dildo and that the victim bled. She said the Defendant referred to the victim as the "love of her life." She said the Defendant told her that the Defendant used a "strap-on" dildo to penetrate the victim's vagina in their sexual relationship. She said that she saw dildos at the Defendant's house, that the Defendant wore a strap-on dildo under her clothing sometimes, and that the Defendant penetrated her vagina with the device during their sexual encounter.

Ms. Reynolds testified that she was with the Defendant when the Defendant left gifts for the victim at the victim's father's house in Abingdon, Virginia. She said this was shortly after she met the Defendant. She said the Defendant told her that the Defendant bought the victim gifts such as cell phones, clothes, and drugs during the relationship and that the Defendant gave the gifts to the victim when the victim's mother was at work. She said that the victim and the victim's mother had lived with the Defendant and that the Defendant and

---

[1] Cohen is also spelled Cowan and Cowen in the transcript. We have used Cohen for uniformity.

the victim's mother had been romantically involved. She stated that the Defendant had photographs of the victim throughout the Defendant's house, that the Defendant had letters and mementos from the victim in a box labeled "Baby Girl's Things," and that the Defendant referred to her home's second bedroom as the victim's room. She said that she never examined the love letters but that she saw the Defendant's handwriting. She said that the Defendant claimed to have kept the victim's underwear from a sexual encounter but that she never saw it. She said the Defendant played the guitar and wrote songs for the victim.

Ms. Reynolds testified that the Defendant wanted the victim to live with them. She said she received information from a neighbor about the victim's age and confronted the Defendant, who initially denied that the victim was a minor. She said that after she confronted the Defendant forcefully and pushed her into a wall, the Defendant admitted the victim was eleven when the relationship started. She said she reported the information to Shanta Stinson, a social worker, but not to the police and thought Ms. Stinson would report it to the police. She said that her relationship with the Defendant ended with the confrontation over the victim's age and that about twenty minutes later, she received a long voice mail message from the Defendant asking her to convince Ms. Stinson and Stephanie, Ms. Stinson's girlfriend, not to report her to the police. Ms. Reynolds said the Defendant stated she would give Ms. Stinson and Stephanie any of her belongings or money if they would not report her. She said that she, Ms. Stinson, and Stephanie recorded the voice mail message and that Stephanie kept the recording. She said she never met the victim or the victim's mother.

Ms. Reynolds testified that a photograph exhibit depicted a tattoo of a broken heart below the word "broken." She identified the tattoo as the Defendant's. She identified a second tattoo in a photograph exhibit that included the letters "G" and "D" representing the Defendant and the victim's initials. She identified photograph exhibits that she said had been displayed in the Defendant's home and were photographs of the Defendant and the person the Defendant identified as "Baby Girl." One photograph depicted the Defendant with her hand on the victim's shoulder. A second photograph depicted the Defendant's and the victim's hands clasped on the victim's shoulder. When shown a handwritten letter, she identified the Defendant's handwriting but said she never read the letter. She said she was familiar with the Defendant's handwriting from seeing the songs the Defendant wrote and envelopes the Defendant addressed.

On cross-examination, Ms. Reynolds testified that although her relationship with the Defendant ended in May 2008, she did not give a statement to the police until September 16, 2009, when they contacted her. She said she was friends with Ms. Stinson but did not know Meredith Cordovan. She said she stayed overnight at the Defendant's home but denied living there. She said that although she never read the letters, the Defendant told her they were love

letters. She denied taking anything from the Defendant's home when the relationship ended. She acknowledged she was untruthful with the police about not having a sexual relationship with the Defendant but said she told the officer that she and the Defendant kissed. She said she did not want to remember the sexual encounter. She said she and the Defendant worked different shifts for the same employer. She agreed that employees had to disrobe at work but did not know whether the Defendant wore a strap-on dildo at work. She said the confrontation that ended the relationship occurred at the Defendant's home, not work. She said she became angry at the Defendant's denial and "put her through the wall." She said Ms. Stinson was present and denied that they threatened the Defendant. She said the Defendant told her that she was calling the police and that Ms. Reynolds must leave. She said the police came to Ms. Stinson's house, told her nothing was wrong, and left. She said the Defendant left an apology message that was about forty minutes long. She gave the recording to Ms. Stinson and Stephanie but did not know what they did with it. She was unaware if Ms. Stinson and Stephanie were friends with the victim's mother. Regarding the photograph of the tattoo with the Defendant's and the victim's initials, Ms. Reynolds said the tattoo appears to have the letters "N," "E," "Y," "D," and "A." Ms. Reynolds said that "Stephanie" was her current girlfriend. She denied that the Defendant bought the clothes Ms. Reynolds wore in court. On redirect examination, Ms. Reynolds testified that the State showed her the handwritten letter before the trial.

Stephanie Stinson testified that the Defendant had been her neighbor when Ms. Stinson lived with Shanta Stinson, her former girlfriend. She said the Defendant lived alone. She acknowledged her Virginia conviction for concealing merchandise under $200. She thought she met the Defendant at a birthday party in 2007. She stated that she did not see the Defendant again for a while but that they eventually became friends and saw each other about once a week. She said Shanta Stinson was also present when they were together weekly. She said that the Defendant spoke of her ex-girlfriend, Michelle, who lived in the Defendant's home but that the Defendant spoke more of Michelle's daughter, the victim. She said the Defendant stated that the relationship with Michelle had been a "cover" and that the real relationship was with the victim. She said the Defendant stated that she let the victim drive her car, that the Defendant provided the victim's transportation to and from school, and that the relationship was like any other relationship when Michelle was not present. She said the Defendant stated that she took the victim's virginity but that she did not reveal the victim's age initially. She said the Defendant called the victim her "baby girl." She said she had seen photographs in the Defendant's home of the Defendant and a girl posed as a couple. She said the Defendant identified the person in the photographs by the victim's name and as her "baby girl." She identified a photograph exhibit of the Defendant and the person the Defendant identified as the victim, which she said she had seen in the Defendant's bedroom.

-4-

Stephanie Stinson testified that the Defendant revealed to Shanta Stinson and her that the victim was eleven years old when the relationship began. She said that she and Tina Reynolds, who was her girlfriend at the time of the trial, went to the Defendant's house to confront the Defendant about the victim's age. She said there was a physical altercation and that afterwards, the Defendant left voice mail messages for Ms. Reynolds begging her to convince Stephanie Stinson and Shanta Stinson not to tell anyone. She stated that they recorded the voice mail messages, that someone contacted the victim's mother, and that she met the victim's mother and gave her the recording a couple of weeks later. She said that the Defendant told several people about the victim's age and that one of the neighbors was going to notify the police and another was going to try to contact the victim's mother. She did not contact the police but thought Shanta Stinson would.

On cross-examination, Stephanie Stinson testified that she was not friends with the victim's mother and had only met her once. She denied that she was upset with the Defendant because the Defendant would not allow Ms. Stinson's sister Brittany to live with her. She said she was not employed and denied having any mental health issues that might affect her memory or ability to testify.

Stephanie Stinson testified that she met the Defendant shortly before the Defendant and Ms. Reynolds's relationship ended. She said the Defendant drank alcohol. She said the Defendant displayed photographs of the Defendant's family, the victim's mother's family, and the Defendant's friends in her house. She said she never signed any statement she gave to the police. When asked if she had discussed her testimony with any other witnesses, she said she lived with Ms. Reynolds.

Shanta Stinson testified that she lived in the Defendant's neighborhood. Shanta Stinson said she lived with Stephanie Stinson in 2008 and recalled meeting the Defendant at a party at their house that year. She said they became friends and talked about the Defendant's former girlfriends, including the victim. She said the Defendant was in love with the victim, could not be in a relationship with the victim "for certain circumstances and . . . reasons," and was depressed about it. She said the Defendant referred to the victim by name and as "Baby Girl." She said the Defendant thought of taking her own life because she could not be with the victim. She said the Defendant claimed to have been in a loving, romantic relationship with the victim. She said the Defendant told her intimate details of a sexual encounter with the victim, which the Defendant said was the victim's first. The Defendant said she carried the victim to the bathtub, bathed her, shaved her, and "popped her cherry" while wearing a dildo. Ms. Stinson said the Defendant claimed to have discussed the sexual device with the victim beforehand.

Shanta Stinson testified that the Defendant stated she felt like a man trapped in a woman's body. She said the Defendant sometimes used the name "Cohen." She said the Defendant talked about "Michelle" as a former girlfriend, but Ms. Stinson later learned that Michelle was the victim's mother. She said the Defendant stated that Michelle was not the type of person with whom she wanted to be involved and that the relationship was "more of a financial situation." She identified the photograph exhibit of the broken heart tattoo, which she said symbolized the Defendant's broken heart over the end of the relationship with the victim. She estimated she was inside the Defendant's house "no more than two" times. She said photographs on the Defendant's walls were "loving, romantic photos" that were professionally made for the holidays. She said the Defendant identified the other person in the photographs by the victim's name, as "Baby Girl," and as the love of her life.

Shanta Stinson testified that on one occasion, the Defendant came to her house and said she had left baby clothes on the porch of a house in Abingdon, Virginia, where the pregnant victim lived. She said the Defendant was upset about the victim's pregnancy. She also said the Defendant was concerned the victim was going to be in trouble because the victim's mother found a love letter from the Defendant to the victim. She said that when she asked the Defendant why she was so upset, the Defendant responded, "Well, there's just reasons." She said the Defendant also stated, "Well, she's younger." Ms. Stinson said the Defendant initially would not tell her the victim's age but eventually said the victim was fifteen or sixteen. She said she calculated that the victim must have been eleven or twelve during the relationship with the Defendant. She said that she asked the Defendant if the reason she was upset was due to the victim's having been eleven or twelve when they were involved and that the Defendant said yes. Ms. Stinson said she discussed the matter with Stephanie Stinson and a neighbor, Gregory Poe. She said that the victim's mother called her and that they met a few days later to discuss what the Defendant told Ms. Stinson. She said she had never met the victim's mother until that day.

Shanta Stinson testified that she, Tina Reynolds, and Stephanie Stinson were at her house when she heard a voice mail message the Defendant left Ms. Reynolds. She said the Defendant stated, "Tina, this is Gwen. I love you. I'm in a lot of trouble. Please talk to Shanta and Stephanie and ask them not to call Michelle or to report me for what I've done." She said the recording also mentioned the victim by name.

On cross-examination, Shanta Stinson testified that Stephanie Stinson was her former partner and had taken her last name. She thought Tina Reynolds and Stephanie Stinson were a couple but said she had not talked to either of them in over a year. She agreed she was with Ms. Reynolds and Stephanie Stinson at the Defendant's house in April or May 2008 when a fight occurred. She said there were threats made to the Defendant about Stephanie Stinson's sister, but she did not know if the fight was related to the Defendant and Ms.

Reynolds's breakup. She said she heard the voice mail message over a speaker but did not know if a recording was made and given to the victim's mother. She agreed that parents sometimes referred to their children as "Baby Girl." She said she saw family photographs in albums at the Defendant's house but not on the walls. She did not know whether the Defendant drank alcohol or used drugs. She did not think that Tina "T.K." Kesterson, a Bristol police officer, lived in her neighborhood at the time.

The eighteen-year-old victim testified that the Defendant was her mother's ex-girlfriend. She said her birthdate was August 18, 1992. She said she met the Defendant on Mother's Day 2004. She said that when she was eleven years old, she and her mother moved into the Defendant's two-bedroom home. She said that her mother and the Defendant had a romantic relationship and shared a bedroom and that she had her own bedroom. She stated that her mother and the Defendant worked different hours and that the Defendant took her to school and picked her up after school. She said that at first, the Defendant was like a parent who took her to eat, shopping, to school, and helped her with homework. She said the relationship changed one or two months later, when she was still eleven years old. She said that on her twelfth birthday, she and her mother returned home from a laundromat and found the house decorated with balloons. She said that the Defendant had written "[p]arty in your birthday suit" on one of the balloons and that she understood this to refer to something that happened previously with the Defendant.

The victim testified that about one and one-half months before her twelfth birthday, she and her mother came home from Walmart. She said that her mother went to get ready for bed and that the Defendant came to the living room chair where the victim was sitting, ran her hands up the victim's leg, and touched her outside her clothing. The victim said she was wearing pink stretchy pants and a t-shirt.

The victim testified that the next incident she remembered involved the Defendant putting her hands down the victim's pants one night and inserting her finger into the victim's vagina, while her mother was in bed. She said that she was standing by the door, which was closed, and that someone outside could not have seen the incident. She said this was about "a month or so before" her twelfth birthday. She said that within the week following this incident, the Defendant asked her what she thought about it and that she responded that she did not know. She said she did not know what to say. She said the Defendant talked about "going all the way" and stated that the victim was old and mature enough.

The victim testified that about a week after the incident at the door, the Defendant attempted to take her virginity in her bedroom. She said that her mother was at work and that it was evening. She said the Defendant took her to the victim's room, sat her on her bed, and told her she would be back. She said the Defendant returned wearing a strap-on dildo under

her clothes. She said the apparatus was "a harness type thing with a fake penis attached." She said that the Defendant got on top of her and tried to penetrate her vagina with the dildo but that she told the Defendant it hurt. She said that the Defendant penetrated her vagina, "but not all the way," and that the Defendant stopped. She said that before this incident, the Defendant talked about using a dildo to have sexual intercourse with the victim.

The victim testified that one or two days after this incident, the Defendant said they should try again. She said this was before her twelfth birthday. She said her mother was at work, and she thought it was daytime and sunny outside. She said that they were in the Defendant's bedroom and that the Defendant penetrated her with the dildo. She said that she did not ask the Defendant to stop and that she bled. She said she had been wearing panties but did not put them on afterwards.

The victim testified that sexual intercourse became routine and happened weekly when her mother was at work. She said that because of the regularity, she knew that within one week of her twelfth birthday, the Defendant penetrated her vagina with a dildo. She said that her birthday was in August and that the incidents continued until December 2004. She said that she remembered trying on a pair of jeans before Christmas and that they fit, but that when she received the jeans for Christmas, they were too big.

The victim testified that she remembered having Christmas dinner with her mother at the Defendant's mother's house. She said her mother returned to work the following day. She said that within a week after Christmas, the Defendant penetrated her vagina with a dildo while they were in the Defendant's bedroom.

The victim testified that a photograph exhibit depicted her weight around the time she moved into the Defendant's home. She said that after she met the Defendant, she developed anorexia and bulimia and that she cut herself. She said that she felt guilty because the Defendant was her mother's girlfriend and that she felt like she betrayed her mother.

The victim testified that in addition to "Gwen" and "Gwendolyn," the Defendant used the names "Michael" and "Cohen." She stated that the Defendant said she felt like a man trapped in a woman's body and that the Defendant dressed like a man. She said the Defendant called her "Baby Girl," her "wife," and "the love of her life." She said the Defendant called her "Baby Girl" in front of others. She said she continued to see the Defendant after the relationship between the Defendant and the victim's mother ended. She said that she and her mother moved from the Defendant's house but that she kept some of her things there and stayed there on occasion. She said she had problems with her mother after the Defendant convinced her that the victim's mother was keeping the victim from

being an adult and that she would have "an amazing life" without her mother. She said the Defendant bought her everything she wanted.

The victim testified that photograph exhibits were Christmas pictures of the Defendant made at Walmart after the Defendant and the victim's mother's relationship ended. She said her mother was not present when the photograph was taken. She said the Defendant told the photographer that they had just been married. She said she wore a dress the Defendant bought and said would look nice in the photographs. She said she and her mother discussed having photographs made together for Christmas, but her mother did not go. She said she did not tell her mother about her and the Defendant's having the photographs made because she did not want her mother to know about the "posing" in the pictures.

The victim testified that she and the Defendant went to Dollywood and Gatlinburg frequently. She estimated they went to Dollywood one to three times per week, both in the summer and during the school year. She said her mother only went with them occasionally, when she did not have to work. The victim said she sometimes missed school for these trips.

The victim testified that she ended the relationship with the Defendant because she met a boy and was not interested in women. She said that before she ended the relationship, the Defendant was angry and controlling if the Defendant thought the victim talked to boys. She stated that she tried to get away from the Defendant by staying with her aunt but that the Defendant came to her aunt's house frequently. She said her aunt thought the Defendant was trying to maintain contact with the victim's mother. She said the Defendant sent letters, pictures, and CDs to her through the victim's classmates. She said the Defendant left letters inside gifts of clothing on the victim's porch in the middle of the night.

The victim testified that around the time she was trying to end the relationship, she had a confrontation with her mother when her mother found her with the Defendant at Walmart. She said her mother discovered they were at Walmart together and came to take her home. The victim identified a photograph of a tattoo that she obtained to cover another tattoo the Defendant took her to get at the Defendant's friend's house. She said the Defendant pushed her to get a tattoo of "a cherry with the side busted out." That tattoo was covered by the subsequent tattoo that depicted stars. She said the blood droplets from the original tattoo were still visible.

The victim testified that a few months after she found out in August 2007 that she was pregnant, she received a letter from the Defendant that frightened her. She said that the letter contained initials for a child and that she worried about what might happen to her child once the child was born. She said that her mother questioned her about things in the letter but that

she denied what her mother asked her. She identified the letter and the Defendant's handwriting in it.

The letter was read for the jury. The letter was addressed to the victim by her full name and "My Baby Girl." The Defendant professed her love for the victim, her sadness that they were apart and that the victim was in another relationship, and her hope that they would reunite. The letter stated, "Our girl, SHH. . . . I love you. I'm waiting. Remember baby's name we gave her. Her – here is middle name (Hope)." The Defendant stated that the tattoos on her arm and leg were for the victim and that she wrote songs for the victim that the victim would never hear. The letter stated that the Defendant promised the victim lifelong commitment "that day on the mountain" and referred to the victim as the Defendant's wife.

The victim testified that she gave birth on May 11, 2008, and that she was pregnant again. She said she did not tell anyone about what happened with the Defendant for a long time because she was "scared of the world's reaction" and her mother's reaction. She said she eventually tired of keeping it inside and could no longer hide it. She said that after her child was born, her mother called and asked her if anything happened between the Defendant and her. She said that she denied it and hung up but that later that day, she told her mother she had been raped, had dealt with it, and did not want to deal with it again. She said that around this time, law enforcement became involved. She said she gave a videotaped interview in Charlottesville, Virginia.

On cross-examination, the victim testified that the Defendant gave her drugs, although she acknowledged telling a social worker that the Defendant did not. She said she was scared when she talked to the social worker.

The victim testified that although her father never legitimated her, he was "an amazing father." She said her mother's former girlfriend, Lori Salazar, moved in with her father because she had nowhere to go after the relationship with the victim's mother ended. She said she knew her father and Ms. Salazar were never romantically involved. She said her mother had been in a relationship with "Bonnie" before they moved in with the Defendant. She said they lived with the Defendant because her mother could not afford a house.

The victim testified that before the photographs were made at Walmart, the Defendant wanted to reunite with the victim's mother and spoke of having a family portrait of the three of them. She said the Defendant took her shopping, bought her a dress, and encouraged her to wear it in the photographs.

The victim testified that she stayed with her father sometimes and her mother sometimes. She said the Defendant worked overnight shifts and returned home early in the

morning before she had to be at school. She said her school was thirty to forty-five minutes from the Defendant's house. She said the Defendant's workplace was five minutes from the Defendant's house.

The victim testified that she smoked and that her mother sometimes caught her and told her not to smoke. She denied that the Defendant told her the Defendant wanted children or that the Defendant was unable to have children. She said her mother did not see the "[p]arty in your birthday suit" balloon. She acknowledged that she spent time at fast food restaurants, that she met a boyfriend at a restaurant, and that she became sexually active with boys. She said she and her mother never discussed sexual aids. She said that although she and the Defendant did not have sex every day, it happened often whenever the Defendant had the opportunity. She said her mother worked many overtime hours when they first moved in with the Defendant. She said the Defendant worked some overtime hours but did not recall the Defendant's working a lot of overtime around Christmas.

The victim testified that the Defendant had been involved with Glenna Mae Roark before the relationship with the victim's mother. She said she met Ms. Roark a few times through the Defendant. She said that her mother's relationship with the Defendant lasted about a year and that she was around the Defendant a year or more after the relationship ended. She stated that her teachers suspected something was wrong, that she was confronted by school counselors about cutting herself, but that she never told anyone about the relationship with the Defendant. She said the Defendant was violent and fought with her mother and her. She said her mother witnessed the Defendant fighting her. She said she was a "rebellious kid" but denied staying out late when she lived with the Defendant. She said that the Defendant picked her up after school around 3:15 p.m. and that they arrived home around 4:00 p.m. She did not know the time the Defendant reported for work but said it was in the evening. She said she rode the bus to her father's house when the Defendant could not pick her up at school. She said the Defendant performed oral sex on her.

The victim testified that with regard to the initials "SHH" in the love letter, the Defendant liked the name Hope. She said that the "S" may have been for the name Serenity and that she told the Defendant she had a friend whose daughter was named Serenity, which she liked. She said she did not know Tina Craig. She identified her daughter by a name other than Serenity Hope. She said the letter had been inside a gift left on her porch or sent to her at school shortly after she found out she was pregnant in August 2007. She said Glenna Mae Roark's granddaughter brought her gifts from the Defendant at school. She said that the Defendant visited Ms. Roark frequently to help her and that Ms. Roark was older, disabled, and had recently died.

-11-

The victim testified that she wrote a letter to the Defendant dated May 27, 2009. The letter was received as an exhibit and stated that the victim wanted to talk to the Defendant and asked the Defendant to call her. It was signed, "Love, [Victim]." She said a detective told her to write the letter because the detective was attempting to record a telephone call by the Defendant. She said the Defendant never threatened her after the relationship ended but said the Defendant threatened her about being with other people during the relationship. She said the Defendant kept her sexual aids in a red duffle bag under the Defendant's bed. She said she burned other letters and pictures the Defendant sent her inside gifts because she did not want anyone to find them.

The victim testified that she thought the Defendant spent the Defendant's money to take her on trips but learned that the Defendant used the victim's mother's money to pay for them. She denied that the allegations against the Defendant were made to seek revenge. She said that her mother eventually saw her tattoo, that she told her mother who took her to get it, and that her mother was upset and told her to have it covered.

On redirect examination, the victim said she heard the recording of the Defendant's voice mail messages for someone named Tina. She said the Defendant begged Tina not to say anything and not to have "the others" say anything. She did not know to whom the Defendant referred. She said that the Defendant stated she was referring to someone with the victim's first name but a different last name and that the victim thought this referred to her. The victim said that although her mother had the recording previously, the victim's boyfriend destroyed it unintentionally by recording over it.

On recross-examination, the victim testified that she did not know how her mother obtained the recording. She said they had it for a few months but was unsure whether a detective listened to it. She said her mother and the detective met a few times without her. She said her mother received the recording around the time they moved back to Tennessee from Charlottesville, Virginia. She did not know anything about angry women being violent with the Defendant. She said that the Defendant and her mother had a "bad breakup" but that her mother reunited with a former girlfriend and moved on. She said the Defendant made sure that the victim wore engagement rings in the Walmart photographs and that the rings were visible. She said that shortly after the relationship with the Defendant began, the Defendant gave her Renate's engagement ring. She identified Renate as the Defendant's former girlfriend. She said the Defendant later bought her an engagement ring. She said that her mother asked her about the rings and that she told her she wore them because she did not want people "hitting on" her.

Meredith Corvin testified that she and her husband lived in the Defendant's neighborhood for twenty-seven years. She said the Defendant and Renate Raupach moved

next door to them in 2001. She said her kitchen window faced the Defendant's front porch. She thought Ms. Raupach lived there until October 2003. She stated that she had a good relationship with the Defendant, that she and her husband loaned the Defendant money to make home improvements, that she and her husband helped with the home improvements, and that her husband did plumbing for the Defendant. She said that the Defendant was displeased she and her husband helped Ms. Raupach move and that the Defendant said they were interfering in the relationship. She said that she and her husband were on good terms with the Defendant afterward, however, and that they mowed the Defendant's yard.

Ms. Corvin testified that two females who appeared to be mother and daughter moved into the Defendant's house in 2004. She said the Defendant identified the females by the victim's and the victim's mother's names. She said that when the victim's mother was not home, she saw the Defendant and the victim "hugged up." She said she saw them washing a car and squirting each other with a water hose. She thought it was horseplay but then it progressed to fondling breasts and long kisses on the mouth. She did not know when this occurred but said she saw this behavior eight to ten times. She said she did not report the conduct to the police because she did not know the victim and the victim's mother and did not know all the facts.

On cross-examination, Ms. Corvin denied that the judge in another courtroom told her to "sit down and shut up" during a hearing involving an order of protection Ms. Raupach sought against the Defendant. She said Ms. Raupach asked the judge to dismiss the order. She said she did not know the victim's mother's last name or where she worked. She said the victim looked like she was sixteen or seventeen years old, not under thirteen. She said she did not involve herself in the Defendant's homelife but acknowledged she went to court at the Defendant's request because the Defendant was afraid of losing her home and job if the restraining order were enforced. She said she did not know a police officer named Tina Kesterson from the neighborhood. When asked about specific individuals, she said that different people were "in and out" of the Defendant's home but that she did not know their names. She said the Defendant told her about an incident in which a woman who weighed over 200 pounds was thrown through a wall by another woman. She said she retired from the postal service in 2006. Before her retirement, she worked from 4:00 p.m. until 12:30 a.m. Mondays through Fridays. She said she left home for work around 3:40 p.m. and returned about 12:45 a.m. She said that she saw the victim back the Defendant's car out of a parking space but that she never saw her driving on a street. She said the Defendant worked at night and worked a lot. She never saw the Defendant drink or use drugs. She said she never saw the Defendant carrying a gun. She said she knew as soon as the Defendant and Ms. Raupach moved in that they were gay and that they were "very open about it." She acknowledged that she probably should have called the authorities about the Defendant and the victim.

Renate Clendaniel testified that her last name had previously been Raupach. She said she and the Defendant had a six-year romantic relationship that ended in 2003. She said they lived as "man and wife." She said they had a "marital ceremony" and wore wedding rings. She said the Defendant considered herself a man. When shown a photograph of the Defendant and the victim, she identified the wedding rings the victim wore on her left ring finger as the rings the Defendant gave her. She said she gave the rings to Ms. Corvin to return to the Defendant after the Defendant requested they be returned. She said the Defendant used her given name as well as "Michael" and "Cohen."

Ms. Clendaniel testified that she and the Defendant were sexually intimate. She said the Defendant wore a strap-on dildo and used it to penetrate Ms. Clendaniel's vagina. She identified the Defendant's handwriting in the letter previously admitted as an exhibit. She identified a photograph depicting a tattoo on the Defendant's shoulder blade. She said the tattoo contained the names "Renate" and "Cohen." The photograph depicts two hearts with banners containing what appear to be words, although the words are not legible. She said the Defendant did not have the tattoo when she left in 2003. She said she had never spoken with or met the victim or the victim's mother.

On cross-examination, Ms. Clendaniel testified that a broken heart tattoo was not unusual. She did not know to whom the rings other than the wedding rings worn by the victim in the photograph belonged. She acknowledged that there were no initials on the wedding rings to indicate they were hers. She said she gave the Defendant the nickname Cohen because she saw "Gwen" written and thought it looked like "Cohen." She agreed that she did not see the Defendant's tattoos after the relationship ended.

Donna Tate, Human Resources Manager of Seaman Corporation, testified as a defense witness that the company had a computerized timekeeping system for its employees. She said that they kept records for five years and that the Defendant's records had been purged from the system. She said, however, that the Defendant was employed from February 29, 2004, until August 18, 2005. She said the Defendant would have had a pre-employment drug screen. She identified an exhibit that was a letter she signed stating that the Defendant worked 2061.25 hours in 2004 and 1397.50 hours in 2005. The letter confirmed her testimony that the "actual punch in/out data" had been purged from the company's computer system.

On cross-examination, Ms. Tate testified that the Defendant worked on a two-week alternating schedule. For one week, she worked two days, had two days off, and worked three days. The next week, she was off two days, worked two days, and was off three days. She agreed the Defendant's employment was terminated for failure to comply with reporting requirements. She said the Defendant's neighborhood was "in the shadows of" the

employer's plant. On redirect examination, Ms. Tate said the employees were paid weekly, meaning that they received a check for thirty-six hours one week and forty-eight hours the next. Eight hours' pay for the forty-eight-hour week was "time-and-a-half." She said shifts were twelve hours, from 7:00 to 7:00. She said employees sometimes arrived early in order to set up machines.

The defense offered an affidavit of Bristol Police Officer Tina Kesterson stating that she lived in the Defendant's neighborhood from October 2003 until November 2005. She said the victim, the victim's mother, and the Defendant lived within walking distance. She said that she had "intermittent casual contact" with them and that neither the victim nor her mother ever contacted her about "any illegal or illicit activity or any concerns regarding same."

Aaron Blevins, a former Bristol Police Department detective, testified that the victim's case was initially assigned to him in May 2008 and that he worked on it until he left the police department in June 2009, which he said was before the Defendant's charges were brought. He said he spoke with the victim, the victim's mother, and the Defendant. He said Officer Kesterson was a good police officer and had previously served in the Army.

On cross-examination, Mr. Blevins testified that the Department of Children's Services (DCS) received a referral around May 21, 2008. He said the case was referred to him one or two days later. He said that on July 3, 2008, he received a fax containing the letter previously identified by the victim as one she received from the Defendant. He said he interviewed the Defendant on July 7, 2008, and the victim's mother on August 19 and October 6, 2008. He agreed there was no activity in the investigation until May 22, 2009, when he met with the victim for the first time. He said this was when the victim returned to Tennessee from Charlottesville, Virginia. He agreed he did not take statements from Shanta Stinson, Tina Reynolds, Michelle Corwin, or the victim's mother. He did not receive or obtain the victim's statement from an advocacy center in Virginia. He agreed that in May 2009, he asked the victim to write a letter and leave it at the Defendant's home. On redirect examination, Mr. Blevins stated that he did not know if the victim was afraid of the Defendant when she left the letter at the Defendant's house. He agreed the Defendant cooperated with his investigation.

Tennessee Valley Authority Police Officer Jimmy Nelson testified that he was a former Bristol Police patrol officer. He said he was employed after Ms. Kesterson left the Bristol Police. He said that on May 25, 2008, he responded to a call involving the Defendant, Ms. Reynolds and "Ms. Stinson." He said that although the call involved the Defendant, she was not present when he arrived. He thought Ms. Reynolds made the call for assistance.

On cross-examination, Officer Nelson testified that he had no independent recollection of the May 25 events. He relied on his report, which stated that Tina Reynolds was the victim of intimidation and that Michael Hagerman was the suspect. On redirect examination, he agreed that his report did not state that he spoke with the Defendant.

Laura Cecil testified that the Defendant was her aunt. She said that to her knowledge, the Defendant did not use drugs and that she had never seen the Defendant drink alcohol. She had never seen the Defendant wear a "phallic object" under her clothing. She said that in 2004, she saw the Defendant at her grandmother's house on Christmas Eve, Christmas Day, and possibly the following day. She said the family's celebration lasted from approximately 2:00 until 11:00. She thought the victim was with the Defendant and recalled the victim's being there one year but was unsure whether it was in 2004. She said the victim's mother was present the entire time the victim was there.

On cross-examination, Ms. Cecil testified that her grandmother lived in Mendota, about twenty minutes from Bristol. She said she was "pretty sure" she spent Christmas morning in 2004 at her grandmother's house. She was sure it was not 2005 because that was the year she began her employment. She was sure that she was at her grandmother's house on Christmas Day 2004 and that she saw the Defendant there on December 24 and 25, 2004. She was unsure whether she was there or saw the Defendant there on December 26, 2004. She said she usually spent the night at her grandmother's for Christmas but did not recall if the Defendant did so in 2004.

On redirect examination, Ms. Cecil testified that the Defendant helped raise her. She said the Defendant took care of her during the week when Ms. Cecil's grandmother was working in West Virginia.

Shawnta Fox testified that the Defendant was her aunt. She said the Defendant did not drink alcohol or use drugs. She had never known the Defendant to wear a prosthetic penis under her clothing. She said she lived in the Defendant's neighborhood a street away from the Defendant from 2003 to 2005. She said she met the victim and the victim's mother. She said the Defendant had two jobs during this time and was a hard worker. She said she was aware of the Defendant's having an altercation with other women "[o]n several occasions." She said she had seen the women at the courthouse the previous day. She said Tina Reynolds had been an occasional houseguest of the Defendant's but did not live with the Defendant.

Ms. Fox testified that she spoke with the victim and the victim's mother. She said nothing illegal happened to the victim, nor was there any discussion of violence by the Defendant toward the victim or the victim's mother.

-16-

On cross-examination, Ms. Fox testified that she did not recall the name of the street she lived on in the Defendant's neighborhood and denied that she did not actually live there. She said she was living with her mother at the time and did not have her mail forwarded from her previous address. She agreed she was an adult at the time. She acknowledged her previous testimony that she had lived at another address in Bristol her entire life. She said that in the time she lived in the Defendant's neighborhood, she saw the Defendant two to three times per week, although some of these times might have been when the Defendant passed in a car. She said she knew the victim and the victim's mother were mother and daughter. On redirect examination, Ms. Fox acknowledged she said in prior testimony in 2009, "I lived here all my life, and I've lived at that address for two years." She said the victim always seemed happy when she saw her.

On recross-examination, Ms. Fox acknowledged a 2006 or 2007 Virginia conviction but did not think the offense was petit larceny. She agreed she had a 2007 Bristol conviction for embezzlement. On further redirect examination, she testified that despite the embezzlement conviction, she was employed in a position in which she handled money.

Anthony Story, Jr., testified that he had lived in the Defendant's neighborhood for about eleven years and was one of the Defendant's coworkers. He said that he had lived by Officer Kesterson but did not recall how long she lived there. He thought he had seen Tina Reynolds during the trial and said she and the Defendant had been in a relationship. He said he went to the Defendant's house to help with repairs one morning in approximately 2009. He recalled it was summertime but was unsure of the year. He said that when he arrived, he saw the Defendant and the victim arguing about the victim's wanting the Defendant to buy her a necklace. She said the victim's mother came outside and made a statement that she assumed the Defendant would not loan her the Defendant's bank card, either. She said the victim threatened to "frame her for something" if the Defendant did not buy the necklace.

Mr. Story testified that to his knowledge, the Defendant had a reputation for honesty. He said he was aware of arguments with the victim's mother and another person. He said, however, that the Defendant was not the type of person who looked for trouble.

Mr. Story testified that he saw a green truck "peel out" from the Defendant's house but did not recall the date. He estimated it was eleven or twelve months before the trial. He said the victim's mother, "Shanta," and the Defendant had argued.

On cross-examination, Mr. Story testified that he had not seen the Defendant since she moved out of the neighborhood after she began dating a woman. He denied that she asked him to testify on her behalf. When asked about a sworn statement he gave the police in which he related the events about the younger person wanting the Defendant to buy a

necklace and the person's mother wanting to use the Defendant's bank card, he said he might have been wrong about the names. In the sworn statement, he said the younger person's "real" name was Tosha but that she also used the name Amy and that the other person was the younger person's mother. Neither Tosha nor Amy was the victim's name. He said it appeared he made a mistake in the sworn statement.

On redirect examination, Mr. Story testified that he was a bond recovery agent and may have worked all night before giving the sworn statement. He said the Defendant did not use drugs and, to his knowledge, did not drink alcohol. He said their employer conducted frequent drug testing.

The trial court ruled that Mr. Story's sworn statement was a prior inconsistent statement and received the statement as substantive evidence. In addition to the information in the sworn statement previously stated, Mr. Story said in the statement that the Defendant identified "Amy" as her stepdaughter and the girl's mother as the Defendant's ex-girlfriend.

Joey Crook testified that Tina Craig was his first cousin. He thought he had met the Defendant twice, the first time being the previous summer. He said that when he met her, she was not wearing a prosthetic penis inside her pants. He said Ms. Craig had a baby about four or five years earlier. He said that he had been employed for about a year as a driver for Domino's Pizza and that he handled money in his employment.

On cross-examination, Mr. Crook testified that Ms. Craig's given name was Christina and that she also used the name Christy. He said that they spent a lot of time together as children but that they recently saw each other about three times per year. He acknowledged he only knew about Ms. Craig and the Defendant's being in a relationship for four or five years because of what they told him. He identified Ms. Craig's daughter by a name other than Serenity Hope. He said he only saw Ms. Craig before her daughter was born during a conversation about baby names.

Russell Young testified that he had known the Defendant for twenty-one years. He said that on July 1, 1989, the Defendant and Glenna Mae Roark rented a space in one of his trailer parks. He said he and his wife lived next door, about fifty to seventy-five feet away. He thought that about twenty years ago, his wife's three grandchildren had stayed overnight with the Defendant and Ms. Roark. He thought the Defendant left the trailer park in 1994 or 1995. He said he never saw the Defendant use drugs or drink alcohol. He said that the Defendant maintained the lawn and that he never saw her wearing a prosthetic penis. He said he did not necessarily see the Defendant and Ms. Roark daily but saw them at least weekly. He said they were quiet, good tenants.

Mr. Young testified that in September 2009, the Defendant approached him about renting the same trailer and space, which then belonged to Ms. Roark's son. He said the Defendant introduced him to a woman and a small girl. He thought the woman's name was Tina Craig. He said that about two weeks after they moved in, he heard a noise, looked outside, and saw police cars at the Defendant's home. He said the Defendant was peaceful and maintained the area outside the home. He did not see the Defendant interact with children other than his grandchildren and said there were no problems with her interaction with his grandchildren. Mr. Young stated that the Defendant visited Ms. Roark after the Defendant moved out. He said Ms. Roark died about three or four years before the trial.

Bernice Hagerman, the Defendant's mother, testified that the Defendant was the youngest of six children. She said her deceased husband, the Defendant's father, had been a coal miner. She said the Defendant was a hard worker who did not cause problems. She said the Defendant was a high school graduate and began working in high school. She said the Defendant did not drink alcohol or use drugs. She had never known the Defendant to wear a prosthetic penis underneath her clothing.

Ms. Hagerman testified that the Defendant was in a relationship with Ms. Roark for about eight or nine years and that they maintained contact after the relationship ended. She said Ms. Roark was about twenty-two years older than the Defendant.

Ms. Hagerman testified that with regard to the August 2005 to December 2005 period of the presentments, she spoke with the Defendant two or three times daily. She said the Defendant usually called her every morning after work and again every evening when she went to work. She said the Defendant generally worked evening shifts but sometimes worked during the day. She said their telephone calls lasted one to two hours.

Ms. Hagerman testified that on August 13, 2004, she had an early breakfast with the Defendant. She said breakfast with the Defendant sometimes lasted two to three hours. She said that on August 14, 2004, she had breakfast at Perkins with her daughter Debbie and the Defendant. She said they talked for a long time. She said that on August 23, 2004, she had breakfast at IHOP with the Defendant and her daughter Sherry. She recalled that Sherry complained about the food and said the Defendant paid for the meal. She said that on August 28, 2004, the Defendant was at her house. She thought the Defendant was there all day and said that sometimes, the Defendant did not go home. She said that on December 24, 2004, the Defendant was at her house for a family Christmas Eve party. She said the Defendant was also at her house for a family gathering on December 25, 2004. She said she and her children spent a lot of time together around the holidays. She said the Defendant sometimes brought the victim and the victim's mother to her house. She said the victim "didn't speak too highly of her mother." She thought the relationship between the Defendant and the

victim's mother began in early 2004 and "began to get rocky" around the end of the year. She said that after an altercation, she saw the Defendant with black eyes and facial bruises. She said that the Defendant saw a doctor, that photographs were taken at the hospital, and that the Defendant missed work. She did not recall whether this was the first or second time the Defendant was beaten.

On cross-examination, Ms. Hagerman testified that regarding the list of dates to which she referred during her direct examination, she made the notes sometime after the Defendant's arrest. On redirect examination, she said her testimony was based upon her best recollection of events six years earlier.

Lori Salazar testified that she was in a relationship with the victim's mother that ended around February 2003. She said she lived in Abingdon, Virginia, with the victim's father. She said that the victim visited her father, often during the daytime, and that the victim lived with them for a little over a year. She said that the victim received mail at their house but that she had not seen any mail from the Defendant, although she was not always the person who checked the mail. She said the Defendant was an honest person. She acknowledged she said otherwise in an internet chat with another person.

Debbie Farley testified that she and the Defendant went to high school together and were neighbors in 2003 and 2004. She said that the Defendant lived about fifteen homes away and that she passed the Defendant's home at least twice a day. She said she waived, said "hello," and engaged in small talk with the Defendant. She never saw or knew the Defendant to drink alcohol, use drugs, be violent, or wear a prosthetic penis.

On cross-examination, Ms. Farley was shown a photograph of the victim and testified that she never saw the Defendant with the person in the photograph. She said she was not inside the Defendant's house. She said the Defendant never mentioned the person in the photograph. On redirect examination, she said she did not remember seeing the victim.

Christina Ford testified that she and the Defendant had been friends since after high school and that they fell in love in mid-2005. She said the Defendant currently lived with her, her mother, her stepfather, and her sister. She said she was pregnant when she and the Defendant became involved. She said they discussed the name Serenity Hope for her child. She said her medical condition, fibromatosis, was the reason for the middle name Hope.

Regarding a photograph exhibit of a tattoo, Ms. Ford testified that the tattoo had the letters SHH, which stood for Serenity Hope Hagerman. She identified a photograph of a dog and a reclined person's torso and legs. She said the person was the Defendant. She said the

photograph did not indicate the Defendant was wearing a prosthetic penis underneath her clothes.

Ms. Ford testified that she often stayed with the Defendant around the time of her pregnancy but did not move into the Defendant's home until late 2008. She said their life was always peaceful. She identified a photograph of her daughter, who she said was the child for whom the name Serenity Hope was discussed, but she said her daughter was given another name. She said that her daughter was born on April 12, 2005, and that the Defendant was with her during her pregnancy. She identified photographs of a child, whom she said was her son. She said the photographs were taken in early August 2004 at Dollywood. She said the Defendant was present when the photographs were taken. She identified a photograph of herself and her son, which she said was taken on a different day at Dollywood. She said that when her daughter was born prematurely and remained in the hospital for two months, the Defendant visited daily and sometimes more than once per day. She identified photographs of her daughter taken during the hospitalization.

Ms. Ford testified that she visited the Defendant's home once or twice a week in August 2004. She said they sometimes left together or met other places. She said they spoke by telephone daily. She said that in late December 2004, she and the Defendant went to Dollywood and the Gatlinburg/Sevierville/Pigeon Forge area to see light displays. She identified photographs she and the Defendant took of the light displays around the end of 2004.

Ms. Ford testified that she and the Defendant saw movies frequently. She said they went to an Abingdon, Virginia, drive-in theater in late August of an unspecified year. She said they ate in restaurants regularly. She said the meals they ate together varied according to their schedules and recalled dining at O'Charley's for chocolate cake.

Ms. Ford testified that her former husband fathered her son. She said she was in a relationship with another man, who fathered her daughter before she became involved with the Defendant. She said that her daughter's father was abusive and that she felt safe with the Defendant. She said they became reacquainted in late 2004 and early 2005 and that she eventually moved into the Defendant's home. She said that her children did not live there but that her daughter sometimes stayed overnight. She said there were never any issues with her daughter's staying there.

Ms. Ford testified that with regard to the letter previously admitted as an exhibit, the statement "you with him, not with me" written in green ink referred to Bill Taylor, her daughter's father. She agreed the letter was written in green and red ink.

-21-

Ms. Ford testified that she knew Stephanie Roark Stinson from school. She said that Stephanie Stinson's sister, Brittney Roark, was in high school in 2005 and asked to move into the Defendant's home. She said she knew Tina Reynolds and Shawnta Stinson from the Defendant's neighborhood but did not talk to them because they were "crazy." She said Ms. Reynolds and Ms. Stinson did not get along with the Defendant. She said Brittney Roark was not allowed to live with the Defendant and her.

Ms. Ford testified that the Defendant was caring, compassionate, and kind with children. She said the Defendant often shopped for others and would give the "shirt off her back" if asked. She said the Defendant had no children and was unable to have them.

Ms. Ford testified that she met Glenna Mae Roark once or twice at Ms. Roark's home, when the Defendant and Ms. Roark's grandchildren were present. She said it took about forty-five minutes to travel from the Defendant's home to Ms. Roark's home, although it might take two to three times as long during "race weekend."

Ms. Ford testified that the Defendant generally worked at night but that she frequently worked overtime shifts. She said the Defendant came home from work around 7:30 or 7:45 and slept until 2:00 or 3:00. She said the Defendant ate, showered, and dressed for thirty to thirty-five minutes. She said the Defendant did errands related to the house, such as paying bills and mowing the lawn. She said they grocery shopped together. She said that if they had bills to pay, they did that before the Defendant slept. She said the Defendant and the Defendant's mother spoke by telephone five to six times a day.

Ms. Ford testified that Meredith Corvin lived next door to them. She said Ms. Corvin tried to see what was happening at their house. She said Ms. Corvin worked at the post office but pried into their affairs when she was not at work, usually in the afternoon.

Ms. Ford testified that Tina Kesterson's police cruiser was always in Ms. Kesterson's driveway in their neighborhood. She said Ms. Kesterson's home was within walking distance of their home and thought Ms. Kesterson's home was visible seasonally from their back porch. She said the trailer homes in the neighborhood were "[f]airly close" together.

Ms. Ford testified that she and the Defendant took day trips to various locations. She said they went to the neighborhood swimming pool sometimes. She said they went to the park "all the time."

On cross-examination, Ms. Ford denied that she and the Defendant had not discussed her trial testimony or the defenses. She acknowledged that she had been to court every time the Defendant's case was docketed in the past year. She recalled testifying at a prior hearing

-22-

and said that she did not have the transcript of her testimony. Ms. Ford said that she and the Defendant began dating in October or November 2008 but that they had been friends and seen each other "on and off" since 2004. She said she never met the victim or the victim's mother but knew who they were and knew they lived with the Defendant. She said the victim's mother needed a place to go and said the Defendant and the victim were not in a relationship. She denied that the Defendant continued to see the victim after the victim's mother moved from the Defendant's home. When shown a photograph of the Defendant and the victim, she said that the photograph was supposed to be a family photograph but that the victim's mother "pitched a fit." She said she heard about this from "[p]eople." Ms. Ford said she spent Christmas with her family and did not celebrate Christmas Eve or Christmas Day with the Defendant's family in 2004. When asked about three initials on the letter previously admitted as an exhibit, she acknowledged the initials were not hers. When asked why the Defendant was not in the photographs she previously identified as exhibits, she said the Defendant rarely had photographs taken.

Ms. Ford said she stayed with but did not live with the Defendant in 2005. She said the Defendant was wrongfully terminated from Seaman in 2005 after a back injury. She acknowledged she had no personal knowledge of the events in the Defendant's home during the time the victim and the victim's mother lived there.

On redirect examination, Ms. Ford testified that she was employed in a management position at Food City in 2004 and 2005. She said that when she worked at Food City, she saw the Defendant in the store with people who she thought were "a male and a young kid" but later learned they were the victim's mother and the victim.

Ms. Ford testified that the Defendant, not the victim's mother, provided a car when the victim and her mother lived with the Defendant. When asked about a Burger King cup in a photograph of the victim, she said the Defendant, not the victim's mother, would have taken the victim to Burger King.

Ms. Ford testified that she called the Defendant "baby" and "honey" but denied calling her "Cohen" or "Michael." She said the Defendant's brother's name was Michael. She said the Defendant confided in her about her "bad breakup" with Renate Raupach.

On recross-examination, Ms. Ford testified that a tattoo shown in the previously admitted photograph exhibit depicting two hearts with banners over them contained the word "Cohen," which she said was Ms. Raupach's name for the Defendant. She said the Defendant did not refer to herself as Cohen. When asked about the letter that was previously admitted as an exhibit, she said she first learned of it in 2009, about a year earlier.

-23-

On further redirect examination, Ms. Ford testified that the reference in the letter to "that day on the mountain" referred to their going to "a favorite place," the Blue Hole in Elizabethton. She said, "And we had Backbone Rock as well." She said a reference to "two years" referred to Ms. Ford's efforts to make her relationship work with her daughter's father. She said the reference to "[n]o matter what sickness" referred to Ms. Ford's neurofibromatosis, a genetic disorder.

Anthony Story, Jr., was recalled and testified that he previously met with the defense investigator, Cotton Johnson, and Officer Branson and mistakenly identified the victim as "Amy." When shown a photograph of the victim, he said the victim was the person to whom he referred as Amy. He said that Amy and a person with the victim's first name associated with each other and that he confused the two when he made his statement. He said that he had seen Amy and the other person at the pool, that he had seen them since 2008, and that he had seen them several times since 2009.

Joey Crook was recalled and testified that he and Ms. Craig, his cousin, discussed the names Serenity and Hope before her second child was born. He said, though, the child was given a different name. He said he did not see the Defendant every day he saw Ms. Craig.

The forty-three-year-old Defendant testified that she lived with her partner, Tina Craig. She said that she had been living at her then-present address for a couple of months and that she had lived at the address identified previously as the location of the events in this case. She had lived at the previous address since about 2000 or 2001. Regarding the previous address, she said she obtained a loan for a mobile home because her former partner, Ms. Raupach, wanted to live there. She said they were together for five to six years and had a rocky relationship. The Defendant testified that she graduated from high school in 1987 and received honors for some of her high school activities. She identified high school photographs of herself. She described her employment history and said that at times, she had two or three jobs. She said that at one of her employers, she had been required to pass an extensive criminal background investigation. She said that she had no criminal convictions and that the matter involving an order of protection for Ms. Raupach was dismissed.

The Defendant testified that the relationship with Ms. Raupach ended because Ms. Raupach beat her and she was tired of the violence. She said she met Ms. Roark after high school at one of her previous employers and became friends. She said Ms. Roark was twenty-two years her senior. She said that their relationship grew serious and that they bought a trailer in Abingdon. She said they rented property from R.L. Young, a former Virginia State Police officer. She said she babysat Mr. Young's grandchildren, played softball with them, and took them on family picnics. She said that when Ms. Roark died in 2006, she honored an agreement to take Ms. Roark's ashes to Panama City.

-24-

The Defendant testified that during the August to December 2004 period alleged in the presentment, she had "constant contact" with Ms. Roark. She said that at the time, Ms. Roark suffered from liver disease, osteoarthritis, and limited mobility.

The Defendant testified that after her relationship with Ms. Raupach, she was involved with Tina Craig. She said she tried to befriend Tina Reynolds and allowed Ms. Reynolds to spend a couple of nights at her home but told Ms. Reynolds she was not interested in her sexually and wanted to be with someone else. She said her friendship with Ms. Reynolds ended around May 2008, near the time the Department of Children's Services said it had an "indication of something going on."

The Defendant said that Exide, one of her employers, drug tested its employees. She said she did not drink alcohol or use drugs. She said she learned her work ethic from her parents and was a hard worker. She said she wanted to be like her father, who made sure that his children had everything they wanted. She said she always wanted a family but was not able to have children.

The Defendant testified that when she worked at Seaman, she began on the day shift from 7:00 a.m. until 7:00 p.m. while she still lived with Ms. Raupach. She said that after she became a permanent employee and before the victim's mother moved into her home, she worked the night shift. She said she never failed a drug test.

The Defendant testified that the victim's mother moved into her home in late 2003. She said that the victim's mother had been living with "Bonnie" but that they were having problems. She said she took the victim and the victim's mother to the Defendant's home for Christmas one year. She stated that the victim's mother was supposed to be a partner but kept trying to get the Defendant to "marry" her. She identified a photograph taken at her mother's home of the victim's mother and herself on Christmas 2004. She identified a photograph of her living room taken in approximately 2002. She said that if someone yelled inside her home, it could be heard in another trailer.

The Defendant denied that she ever groped, fondled, or kissed the victim. She said that she hugged the victim once or twice and that she tried to be a good parent. Regarding the photographs taken at Walmart, she stated that the victim's mother was supposed to participate but that the victim's mother was angry and did not want to participate because it would anger Bonnie. She said the victim's mother eventually returned to living with Bonnie. She said that after the victim's mother moved out of her house, the victim did not stay, though the victim wanted to stay with her. She said the police were called the night the victim's mother moved out because the victim did not want to leave. She said the relationship ended when the victim's mother came over "just before Thanksgiving" in 2004

and took her belongings. She recalled the victim's mother throwing $80 at her when the Defendant said she had no money for Thanksgiving dinner because she bought the victim's school supplies and books. She said the victim's mother never paid for anything. She said the victim and the victim's mother attended the Defendant's mother's Christmas celebration in 2004, although the Defendant and the victim's mother had separated. She was not aware of the victim and the victim's mother staying overnight at her house after Thanksgiving but said she was unsure because the relationship ended quickly and she worked so much.

The Defendant testified that the victim told her that the victim was not close to her mother and that her mother did not care about the victim. She said the victim told her the victim stayed at her father's house more than elsewhere. The Defendant said the victim's mother had no permanent residence and brought home too many women. She said the victim's mother allowed the victim to smoke and stay with the victim's aunt, whose boyfriend used drugs at the aunt's apartment. She said her relationship with the victim's mother ended abruptly because she did not think it was right.

The Defendant testified that a photograph exhibit depicted her mother outside her home with the Corvins's trailer in the background. She said the Corvins's bedroom was located near her bedroom. She said their living room was near her second bedroom.

The Defendant testified that "they" ran into Tina Kesterson while shopping at Walmart. She said that "[t]hey" wanted the Defendant and the victim's mother to have a wedding ceremony. She said that she complained about the victim's mother allowing the victim to stay out late, smoke, and have boyfriends and that the victim's mother told her that she was "trying." She said she did not want a wedding ceremony but told the victim's mother she would agree if the victim's mother promised she would try to be a better mother. She said she later discovered the victim's mother went to nightclubs while she was at work. She said the victim's mother selected wedding bands for them that the Defendant purchased. She said she did not wear jewelry and "really didn't wear" the band. When shown one of the Walmart photographs of the victim and herself, the Defendant said she did not see any rings on her fingers. The photograph showed the Defendant's right hand, which did not contain any jewelry, but not her left hand. She said she tried to make the relationship with the victim's mother work. She said that she talked to the victim's father about adopting the victim, that he said he would talk to the victim's mother about it, and that he later told her the victim's mother would not agree because the Defendant was a strict parent.

The Defendant testified that she did not tell the Walmart photographer that she and the victim were married. She said she did not wear a ring in the photographs. She said the victim's mother brought the victim to Walmart for a family photograph but did not want to participate because Bonnie was mad.

-26-

The Defendant testified that the victim's mother was mad at her one night and pushed her against a wall but did not recall the reason they argued. She said she told everyone who moved into her home that she was not a violent person and did not believe in violence.

The Defendant testified that she did not take the victim to get a tattoo. She denied that she let the victim drive one of her cars. She said the victim's mother drove her Mustang more than she did.

The Defendant testified that Tina Kesterson lived within walking distance of her home when the victim and the victim's mother lived with her. She said Officer Kesterson was one of the responding officers for the incident involving Ms. Raupach. She said her relationship with Ms. Raupach ended around 2003.

The Defendant testified that she babysat other children. She said that Brittney Roark wanted to move into her home but that she refused. The Defendant denied wearing or having ever owned a "fake penis."

The Defendant testified that her broken heart tattoo was for Tina Craig, not the victim. She said she also had a tattoo of a black heart in lace that was for Ms. Craig. She said she had five tattoos, but later said she had six tattoos. Regarding an arm tattoo, she said it was a tribal tattoo with a black heart and arrows representing Ms. Craig and the child.

Regarding Ms. Reynolds's testimony that the Defendant called her by the victim's name, the Defendant testified that she had several friends with the victim's first name and identified one by first and last name. She also said she knew several people named Amy.

The Defendant testified that she and Ms. Craig went to Gatlinburg in 2004 to see the light displays. She identified a photograph of her mother's Christmas tree in 2004.

The Defendant testified that statements in the letter previously identified as an exhibit were just thoughts she wrote and put in a notebook. She said Ms. Reynolds came to her house and beat her. She said Shawnta Stinson, Brittney Roark, "Pam," and "Stephanie" were also present and beat her. She said they took things from her home and made her write "this" but she did not specify what they made her write. When asked if they took any panties, a lock box, or sexual aids, she denied the existence of such things. She said that the statement "you're with him not with me" in the letter referred to Ms. Craig's relationship with Bill, the father of Ms. Craig's daughter. She said Ms. Craig did not want her daughter to grow up not knowing her father. The Defendant said this hurt her. She said that they found out on the Defendant's birthday that Ms. Craig was pregnant and that she attended Ms. Craig's ultrasound appointment. She said she wanted to spend her life with Ms. Craig.

The Defendant testified that she did not mail or deliver the letter to the victim's father's home or give it to anyone. When asked about part of the letter, she said she wrote "my girl" referring to the victim and "our girl" referring to Ms. Craig's child. She said she and Ms. Craig wanted to name the child Serenity Hope because they "believed in the serenity prayer." She said that both Ms. Craig's and the child's life were in danger.

The Defendant testified that when she wrote the letter, she and Ms. Craig were friends but were not yet involved romantically. She said Ms. Craig was still involved with "Bill." Regarding her statement in the letter that she lived in their memories, she said this referred to their memories as friends. She said they took trips together, went to the Blue Hole to swim, and had picnics. She said the letter referred to difficulties Ms. Craig had experienced in other relationships and to Ms. Craig's medical condition. She said the letter referred to advice the Defendant received to let Ms. Craig have a relationship with Bill. She said the statement about "living lies and alibis" referred to her efforts to maintain the relationship with the victim's mother in order to afford the victim a secure and happy environment. She said other statements in the letter demonstrated that she was not happy without Ms. Craig. She said she wrote songs for Ms. Craig. She said the letter referred to photographs she had of Ms. Craig and herself. She said the letter referred to a day on the mountain when the Defendant committed not to abandon Ms. Craig despite Ms. Craig's failing health. The Defendant said the women who beat her made her add the victim's full name, "my baby girl," the victim's initials, and "I love you and I'm waiting" to the letter.

The Defendant denied the allegation in the first count of the presentment charging her with sexual penetration of the victim in August 2004 in the doorway while the victim's mother was in a bedroom. She denied she ever sexually abused the victim. She denied using a dildo to penetrate the victim while they were in the bedroom. She denied buying cigarettes, drugs, or alcohol for the victim. She said she never took the victim to Dollywood or took the victim out of school. She said the victim stayed with the victim's father, the victim's aunt, or the victim's grandmother most of the time.

The Defendant testified that on August 4, 2004, she spent the night at Glenna Mae Roark's house in Abingdon. She said the next day, she went to Advance Auto, bought gas at Cedar Creek, and ate at Papa John's with Ms. Craig. She said that on August 6, 2004, she called her mother in the morning and that she went to Gatlinburg with Ms. Craig in the afternoon, where they stayed for at least three days, returning around August 10.

The Defendant testified that she ate breakfast with her family every day if she did not work and sometimes on work days. She said she had breakfast with her family on August 23, 2004. She said they usually ate at IHOP or Perkins but sometimes ate at Shoney's.

The Defendant testified that on August 24, 2004, she went to pay her car insurance and electric bills. She said she was with Glenna Mae Roark on August 25, August 28, and August 29, 2004.

The Defendant testified that she was at her mother's house on December 25 and 26, 2004, and that she visited Ms. Roark on December 26 and 27. She said she was with Ms. Craig on December 27 and 28 and worked on December 29. She said that on December 30, she withdrew money from an ATM, went to Walmart with Ms. Craig, and bought gas at Cedar Creek. She said they also went to Gatlinburg to see the light displays on December 30. She said that she spent December 31 with Ms. Craig and that she shopped at Walmart.

Regarding her work schedule, the Defendant testified that she always arrived early for work to set up the machines. She said that if she encountered a train on the way to work, she waited at least fifteen minutes. She said she sometimes bought restaurant food or went to her sister's house before work if there was no food at home. She said she typically awoke at 3:00 p.m. and was out of the house by 4:00 p.m. The Defendant stated that when she left work in the mornings, she talked to her mother and stopped to buy gas. She said she drove the victim forty-five minutes to school in Abingdon. She said she occasionally picked up the victim after school. She thought the victim's school day ended at 3:00 p.m. The Defendant stated that the victim's mother's employer closed around 4:00 or 4:30 p.m. and that it took the victim's mother about ten minutes to get home unless race traffic were involved. She said her work schedule varied and sometimes involved weekends. She stated that she tried to get her employment time records after she was charged with the offenses but that they had been purged. She said she paid the expenses to maintain her household and cars.

The Defendant testified that contrary to Ms. Reynolds's testimony, she did not keep love letters and other items. She said she never made the telephone call involved in the purported voice mail message for Ms. Reynolds. She said it was possible Ms. Reynolds called her cell phone. Regarding the testimony that she called Ms. Reynolds by the victim's name, the Defendant said she was supposed to go on a date with a person with the same first name as the victim.

The Defendant testified that Stephanie Stinson became angry with her after the Defendant refused to allow Ms. Stinson's sister, Brittney Roark, to live with her. She said this "made them all angry." She said Shawnta Stinson, Ms. Reynolds, and Stephanie Stinson were involved in beating her.

The Defendant testified that the alleged incident involving the "party in your birthday suit" balloon did not occur. She said the victim and the victim's mother were not at her

house on the victim's birthday. She said there was a birthday party after the birthday, at which the victim's mother was present. She said there were balloons at the party.

The Defendant denied owning any strap-on sexual aids. She said the police never came to her home and confiscated any such items. She said she did not make advances toward the victim. She denied that she was ever involved in groping, fondling, or kissing the victim or that they engaged in horseplay with a water hose. She said Ms. Corvin disliked her after she ended her relationship with Ms. Raupach. She said the victim never exhibited signs of eating disorders or cutting herself. She denied choosing the dress the victim wore in the Walmart photographs. She said that the only time she was at Dollywood with the victim was for a company picnic and that the victim's mother was also present. The Defendant said she was never charged with trespassing at the victim's school or harassment related to events at Lori Salizar's residence. She said Ms. Raupach called her Cohen but that she went by Gwen and never wanted to be called Cohen. The Defendant said she made her best efforts to reconstruct information about her whereabouts and actions six years ago.

The Defendant testified that she worked at Walmart. She said her job involved handling cash. She said she did not have any criminal convictions.

On cross-examination, the Defendant testified that the victim and the victim's mother lived with her for about a year. She agreed the victim was eleven years old when they moved into her home. She agreed she wanted to establish a substantial parental relationship with the victim. When asked if she spent time alone with the victim, she answered, "Not that much." She said she was a busy person and often worked overtime.

The Defendant acknowledged that the victim once stated that she wanted the Defendant to be her "boy toy." She said the victim's mother was present when the victim made the statement in her ear. She said the victim stated she had a crush on the Defendant. She said that the victim flirted with her and that she told the victim's mother privately that she did not want the victim in the home. She said that after this conversation, the victim stayed at her father's house about 90% of the time.

When asked if she dressed like a man, the Defendant testified that she dressed like herself. She said she wore a tie once. She denied calling herself Cohen. She said that "GD" on one of her tattoos referred to her first and middle names. She said Ms. Raupach forced her to get the "Cohen" tattoo. She denied ever owning a dildo or harness. She acknowledged that she and the victim's mother bought gifts together for the victim. She acknowledged that she continued to buy gifts for the victim after the victim's mother moved out of her house and said she did so "as a parent."

The Defendant testified that the victim's mother brought the victim to Walmart but did not want to be in the photographs. She said that the photographs were just family pictures and that the poses were not her idea. She said that the victim wanted the photographs and that she was "stupid" for agreeing. She agreed she wanted to adopt the victim. She denied the victim's mother told her not to contact the victim after the victim's mother moved out. She denied the victim's mother caught the victim and her at the mall together. She said she received a call at work advising her that the victim was missing. She said the victim was supposed to be with her aunt. She said that the victim was at the mall but that they were not together. She denied buying rings for the victim. She said that the rings were in her home when the victim lived there, that the victim's mother knew the victim had them, and that she did not tell the victim to wear a ring on her ring finger. She denied selecting or buying the dress the victim wore in the photographs but said she was with the victim and the victim's mother when it was purchased.

The Defendant denied writing letters to the victim. She acknowledged she may have said in her statement to a detective that she wrote letters to the victim but insisted she had not. She said that she was nervous when she was at the police station and that it was a mistake. She maintained she wrote the letter that was previously admitted as an exhibit to Ms. Craig and that she wrote the victim's name and "baby girl" on the letter because she was being beaten and forced to write it. She said she had a red pen when she was forced to write the victim's name, even though she wrote the letter in red ink to Ms. Craig years earlier. She denied calling the victim "baby girl" but then said she used the expression to refer to the victim and "everyone." She said she wrote "my girl" and the victim's initials on the letter referring to the victim as her daughter, not as a lover. She said "our girl" referred to Ms. Craig's child. She said that although Ms. Craig testified that she did not learn of the letter until 2009, she and Ms. Craig talked on the telephone about it earlier. She said she knew of Ms. Craig's pregnancy but not the victim's when she wrote the letter. She said the victim left her a voice message at a later date and told her about the victim's pregnancy. She denied she wanted to raise the victim's child.

The Defendant acknowledged that she took the victim with her when the Defendant got a tattoo. She denied taking the victim to get the victim a tattoo. She said her broken heart tattoo was for Ms. Craig. She did not recall Ms. Craig's testifying that the Defendant's broken heart tattoo was for Ms. Raupach. She said all her relationships resulted in a broken heart but denied that the victim was one of the people to whom she referred. She denied telling the police she did not know whether the victim got a tattoo.

When asked about her testimony at a prior hearing regarding her employers, the Defendant acknowledged that she did not include one of her employers but said she did not understand the question. When asked about her prior testimony that no one other than the

-31-

victim's mother lived with her before Ms. Craig, she said she did not understand the question. She acknowledged her testimony later in the same hearing that she had lived with Ms. Roark. She said she did not realize she was supposed to identify each person with whom she had lived. She denied ever referring to the victim as the love of her life.

The Defendant testified that the letter's reference to hands touching her and arms holding her referred to Ms. Craig rubbing her injured neck and back and holding her when she cried about Ms. Roark's death. She denied putting photographs of the victim on her wall and said she only had photographs of her family on the wall, but then she said she had Ms. Craig's photographs on her wall. She said she had photographs of the victim in an album. She said Ms. Reynolds and Shawnta Stinson saw her albums. She did not know how law enforcement received the photographs of the victim and her. She said the photographs in question were thrown away when she and Ms. Craig moved, but she also said the Stinsons may have taken them the night she was beaten. She said the statement in the letter to "[l]oving an old washed up. Fat want to be a man [sic]." referred to the father of Ms. Craig's daughter, not to the Defendant. She said he was older and looked like Colonel Sanders. The Defendant acknowledged that Ms. Craig did not name her daughter Serenity Hope. She said Ms. Craig was mad at her.

On redirect examination, the Defendant testified that she told the photographer they wanted a family portrait. She said there was never a search warrant executed that resulted in law enforcement obtaining the photographs. She said she went to the police voluntarily because she was honest. She said the police never asked her for any items from her home. She said some clothing and personal belongings were taken from her home when she was beaten. She said Ms. Reynolds had worn some of her clothing during the trial. She agreed she caught the victim stealing cigarettes from the victim's mother.

The victim's mother testified that she lived with the Defendant for more than a year. She said that she lived with the Defendant in August 2004 when the first alleged crime happened but that she was unaware if she was home when it occurred because she did not know about it.

Conley Garland testified that he met the Defendant at work and had known her for six years or more. He said he had never known the Defendant to drink, use drugs, or wear a prosthetic penis under her clothes. He said he did not spend time with her away from work. He said they worked overtime hours. He said the Defendant had an honest reputation.

Tina Craig was recalled and testified that she did not throw away any of the Defendant's photographs.

The jury found the Defendant guilty of five counts of rape of a child. The trial court sentenced the Defendant to twenty-five years for each count, with three of the counts being imposed consecutively, for an effective sentence of seventy-five years. The judgments reflect sentences of twenty years for each count and an effective sentence of sixty years. Although the record does not reflect the reason for the change in the lengths of the sentences, we presume the court modified the sentences to the presumptive length of twenty years under the law applicable to the Defendant's crimes. See T.C.A. § 40-35-210(c) (2003) (amended 2005); Blakely v. Washington, 542 U.S. 296, 305 (2004) (holding that an increased sentence imposed based upon judicial fact-finding, rather than jury fact-finding, violates the Sixth Amendment); see also Cunningham v. California, 549 U.S. 270, 290 (2007).

**I**

The Defendant contends that the evidence is insufficient to support her convictions. The State contends that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

At the time of the offenses, the relevant statute provided, "Rape of a child is the unlawful sexual penetration of a victim . . . if such victim is less than thirteen (13) years of age[.]" T.C.A. § 39-13-522(a) (2003) (amended 2005, 2006, 2007, 2011). The Defendant's argument is based, in part, upon matters of witness credibility. She argues that the State's witnesses were not credible, that some of the State's testimonial evidence was not corroborated, and that her testimony and favorable witnesses were credible.

The bill of particulars specified that count one occurred on or about August 2004, on a different date than counts two, three, and four, about two weeks before the victim's birthday, at night, in the living room, and entailed the Defendant's penetrating the victim's vagina with her finger. The record reflects that the victim testified that about one month before her twelfth birthday, she was standing by the front door when the Defendant put her hands down the victim's pants and inserted her finger into the victim's vagina. She said that on this occasion, her mother was in bed and that it was night. The victim's birthdate was August 18, 1992. Considered in the light most favorable to the State, this evidence is sufficient to support the conviction for count one.

The bill of particulars specified that count two occurred on or about August 2004, on a different date than counts one, three, and four, in the victim's bedroom, within a week of count one, and involved the Defendant penetrating the victim's vagina with a dildo. The record reflects that the victim said that about a week after the incident at the door, the Defendant took her to the victim's room, sat her on her bed, and told her she would be back. She said the Defendant returned wearing a strap-on dildo. She said the Defendant got on top of her and penetrated her vagina, "but not all the way." Tina Reynolds and Stephanie Stinson testified that the Defendant claimed to have taken the victim's virginity using a strap-on dildo. Considered in the light most favorable to the State, the evidence is sufficient to support the conviction for count two.

The bill of particulars specified that count three occurred on or about August 2004, on a different day than counts one, two, and four, after count two but before the victim's twelfth birthday, in the Defendant's bedroom, during daytime, and involved vaginal penetration with a dildo. The victim testified that one or two days after the events involved in count two, the Defendant said they should try again. She said that when they were in the Defendant's bedroom, the Defendant penetrated her vagina with a dildo. She said this was before her twelfth birthday. She recalled that her mother was at work and that it was daytime and sunny outside. Considered in the light most favorable to the State, the evidence is sufficient to support the conviction for count three.

The bill of particulars specified that count four occurred on or about August 2004, on a different day than counts one, two, and three, and within a week following the victim's twelfth birthday. This event involved vaginal penetration of the victim with a dildo and occurred in the Defendant's bedroom. The victim testified that after the abuse began, it occurred weekly while the victim's mother was at work. She said that within one week of her twelfth birthday, the Defendant penetrated her vagina with a dildo. Considered in the light most favorable to the State, the evidence is sufficient to support the conviction for count four.

The bill of particulars specified that count five occurred after December 25, 2004, but before December 31, 2004. This event occurred in the Defendant's bedroom and involved penetration of the victim's vagina with a dildo. The victim testified that her mother returned to work the day after Christmas 2004. She said that within one week of Christmas, the Defendant penetrated her vagina with a dildo while they were in the Defendant's bedroom. Considered in the light most favorable to the State, the evidence is sufficient to support the conviction for count five.

The evidence is sufficient to support the Defendant's convictions. She is not entitled to relief on this basis.

**II**

The Defendant contends that there was a material variance between the presentment, the bill of particulars and multiple amended bills of particulars, the jury instructions, and the proof for counts one, two, and three. The Defendant argues that the victim's testimony does not correspond with the presentment, the bills of particulars, and the jury instructions. The victim testified that the first instance of abuse occurred about a month before her twelfth birthday, that the second incident occurred about a week later, and that the third incident occurred one or two days after the second incident. The Defendant argues that based upon the victim's testimony and the victim's birth date of August 18, 1992, counts one, two, and three occurred in July 2004, but that the charging instrument, bills of particulars, and jury instructions specified offenses in August 2004. The State responds that any variance was not fatal. We agree with the State.

A variance between information in the presentment and the evidence presented at trial is fatal in Tennessee only if the variance is "material" and "prejudicial" to the defendant. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "Material" means that an essential element of the charge is lacking, such that the allegations and proof do not correspond substantially. See id. "Prejudicial" means a substantial right has been affected: either the defendant was misled at trial and could not prepare a defense or is exposed to a risk of double jeopardy. Id. A variance is not material or prejudicial when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Id.

Tennessee Rule of Criminal Procedure 7(c) states, "On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." The purpose of a bill of particulars is to provide a defendant with sufficient information about the charged offense to allow the defendant to (1) prepare a

defense, (2) avoid prejudicial surprise at the trial, and (3) preserve a claim of double jeopardy. State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991) (citing State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984)); State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000). The State should make every effort to provide descriptive information of the offense and narrow the time-frame of the indictment, even if exact dates are unavailable. Byrd, 820 S.W.2d at 742.

> If, however, the state is truly unable to give even an approximate time of the alleged offense by means of descriptive reference, a conviction may nevertheless be affirmed if in the course of the trial it does not appear that the defendant's defense has been hampered by the lack of specificity. Conversely, a conviction must be reversed if trial testimony establishes that the state had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant.

Id. "If the State significantly deviates from the bill of particulars at trial, this potentially could be a ground for reversal, but only if a defendant can . . . demonstrate prejudice in the form of unfair surprise or inability to prepare an adequate defense." State v. Sherman, 266 S.W.3d 395, 409 (Tenn. 2008) (citing Byrd, 820 S.W.2d at 741).

The record reflects that an October 27, 2009 presentment alleged nine offenses occurring one per month from November 2004 to July 2005, and one offense occurring between August 1, 2005 and August 7, 2005. After the presentment was returned, the Defendant filed a motion for a bill of particulars. On January 4, 2010, the State filed a bill of particulars alleging vaginal penetration with a dildo on the same dates as specified in the presentment. On August 25, 2010, the State filed an amended bill of particulars alleging the same dates as specified in the presentment and the previous bill of particulars. This amended notice added the allegation that from the time the victim was eleven years old until she was thirteen years old, the Defendant penetrated her vagina with a dildo at least once per week. On August 26, 2010, the State filed a second amended bill of particulars that added some factual information about the location within the home where the abuse occurred and with regard to the December 2004 incident, a description of the victim's clothing and a narrowing of the date of the offense as after December 26 and before December 31.

A second presentment was returned on September 14, 2010. It alleged six offenses, the first four of which occurred in August 2004, the fifth in December 2004, and the sixth between February 14, 2005 and an unspecified date in May 2005. An amended bill of particulars was filed on September 20, 2010. Regarding counts one, two, and three, this bill of particulars specified:

a.    That Count 1 occurred on or about August, 2004 (on a different date than in Counts 2, 3, and 4) at [the Defendant's address]. The offense occurred at night in the living room. The offense occurred about two weeks before the victim's twelfth birthday. The State is alleging that the defendant penetrated the victim's vagina with her finger;

b.    That Count 2 occurred on or about August, 2004 (on a different date than Counts 1, 3, and 4) at [the Defendant's address]. The offense occurred in the victim's bedroom. The offense occurred within a week of the allegation in Count 1. The State is alleging that the defendant penetrated the victim's vagina with a dildo. The State is unaware of the approximate time of day that the offense occurred;

c.    That Count 3 occurred on or about August, 2004 (on a different date than in Counts 1, 2, and 4) at [the Defendant's address]. The offense occurred during the day in the defendant's bedroom. The offenses occurred after Count 2, but before the victim's twelfth birthday. The State is alleging that the defendant penetrated the victim's vagina with a dildo[.]

Another amended bill of particulars was filed on November 9, 2010. There were no new or different allegations regarding counts one, two, or three.

At the trial, the trial court instructed the jury with respect to counts one, two, and three:

Count One of the presentment alleges an act of rape of a child against [the victim], date of birth August 18, 1992 and refers to the following conduct:

On or about August of 2004 in a month before [the victim's] birthday the defendant penetrated [the victim's] vagina with her finger while inside the doorway of the defendant's home[.]

Count Two of the presentment alleges an act of rape of a child against [the victim], date of birth August 18, 1992 and refers to the following conduct:

On or about August of 2004 and on a date approximately one week after the allegation in Count One the defendant penetrated [the victim's] vagina with a dildo while in [the victim's] bedroom at the defendant's home[.]

Count Three of the presentment alleges an act of rape of a child against [the victim], date of birth August 18, 1992 and refers to the following conduct:

On or about August of 2004 and a day or two after the allegation in Count Two the defendant penetrated [the victim's] vagina with a dildo while in the defendant's bedroom at the defendant's home[.]

The Defendant argues that the presentment and bills of particulars notified her that she must defend against charges of offenses in August 2004 but that the victim's testimony placed the events constituting counts one, two, and three in July 2004. The allegations of the date of the events constituting count one vary from about two weeks to one month before the victim's twelfth birthday. The time period during which the events alleged for counts two and three varies due to allegations that they occurred after the previous counts.

We conclude that the bills of particulars adequately identified the charged offenses. They included factual allegations of the approximate date, as well as specific identifying facts, such as the location of the offenses and the type of penetration involved. The victim's testimony was consistent in most respects with the allegations, and her testimony that count one occurred approximately one month, rather than two weeks, before her birthday was not material. She described each of the offenses by specific, unique facts. Any deviation from the presentment and the bills of particulars and the trial evidence was not material.

We conclude, as well, that the Defendant has not demonstrated that she was prejudiced. As we have noted, the Defendant was provided an approximate date of the offenses and other identifying information about the nature and location of the offenses in order to assist her in formulating a defense and to protect her from double jeopardy. At the trial, she was afforded the opportunity to cross-examine the victim. The Defendant presented evidence regarding her activities on some specific dates in August and December 2004, as well as her work schedule and other daily activities that would have limited her private access to the victim. She also presented proof that the victim stayed with the victim's father more than the victim stayed at the Defendant's house. She presented evidence of her employment and total hours worked per year for Seaman Corporation for February 29, 2004, through August 18, 2005. The daily time records were no longer available at the time of the trial, and given their unavailability, the benefit to be gained from them for the defense would have been no greater had the presentment and bills of particulars identified the dates of counts one, two, and three as having been in July rather than August 2004. The Defendant

has not shown that her defense was prejudiced by the deviation. She is not entitled to relief on this basis.

## III

The Defendant contends that the trial court erred in denying her motion to dismiss the presentment due to pre-accusation delay. The State contends that there was no infringment on the Defendant's due process rights. We agree with the State.

A criminal defendant has the right to due process. The delay between the commission of an offense and the initiation of formal proceedings may violate a defendant's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 8 of the Tennessee Constitution. State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996). In State v. Dykes, 803 S.W.2d 250, 256 (Tenn. Crim. App. 1990), relying upon United States v. Marion, 404 U.S. 307 (1971), this court stated that

> [b]efore an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused.

In State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997), the supreme court acknowledged the "Marion-Dykes" analysis for cases of delay in charging a defendant. But cf. Gray, 917 S.W.2d at 673 (holding that "[i]n determining whether pre-accusatorial delay violates due process, the trial court must consider the length of the delay, the reason for the delay, and the degree of prejudice, if any, to the accused").

The record reflects that the offenses were reported to the Department of Children's Services on May 20, 2008. There was an approximate seventeen-month delay between the report and the return of the presentment on October 27, 2009. The crimes occurred in August and December 2004, over five years before the presentment was returned. The delay is sufficient to warrant further inquiry.

The Defendant argues that she was prejudiced by the delay because her employer's time records were purged in December 2009, which would have aided an alibi defense by showing the exact dates and times she was at work. Although the Defendant does not contend that the delay was intentional, she argues that upon her showing of a delay, the State was required to demonstrate its reason for the delay. She argues that because the State did not do so, she is entitled to relief. The Defendant's legal argument is misplaced. Dykes

places the burden upon the Defendant, not the State, to show the existence of the delay, actual prejudice, and the reason for the delay. See Dykes, 803 S.W.2d at 256; see also Utley, 956 S.W.2d at 495 (holding that prejudice could not be presumed from the length of the delay and must be proven by the defendant); cf. Gray, 917 S.W.2d at 673-74 (dismissing prosecution as violative of due process and noting the defendant's *prima facie* showing of prejudice).

Regarding the question of actual prejudice, the Defendant argues that she was prejudiced by the delay because her employer's time records were destroyed shortly after the presentment was returned. She claims that had the delay not occurred, she could have used these records to establish an alibi. The record reflects undisputed evidence that the Defendant worked night shifts and sometimes worked overtime hours. She worked an alternating schedule that provided two or three days off at a time. There is evidence she had more than one job at times, although there was no evidence of the precise time periods of her multiple employment. There was evidence the Defendant talked by telephone and spent time in person with her family members regularly. There was proof, as well, that the victim stayed at her father's house more than she stayed at the Defendant's house. No exact dates or times were identified for the offenses. The November 9, 2010 bill of particulars identified count one as occurring at night, count three as occurring in the day, and the other counts as having occurred at an unknown time of day. Even if the Defendant's time records had been available, they would not have established that she did not commit the offenses because the exact dates and times of the offenses were not identified. The Defendant has not established that she suffered actual prejudice due to the delay.

In any event, the Defendant does not contend that the State caused the delay in order to gain a tactical advantage nor does the record support such a conclusion. At the pretrial hearing on the motion to dismiss, defense counsel acknowledged that he was unaware of purposeful delay by the State. The Defendant has not established that her due process rights were violated by the pre-accusation delay, and she is not entitled to relief.

**IV**

The Defendant contends that the trial court erred in failing to conduct an *in camera* review of the victim's DCS records for exculpatory evidence. The State responds that the Defendant has waived the issue and that in any event, the court properly denied the Defendant's request for an *in camera* review. Although we do not consider waiver occurred, we conclude that the Defendant is not entitled to relief.

The record contains the State's motion to quash a subpoena issued by the Defendant for DCS records pertaining to the victim. The subpoena is not in the record. The record

contains a written response to a defense motion for the victim's DCS and juvenile court records, although the Defendant's motion is not in the record. The State filed a pleading entitled "Brady Response #1" which stated:

> When the victim . . . was first questioned regarding the allegations in this matter, she denied that the defendant had done anything to her. The victim later disclosed the allegations. She stated that she was scared to talk about the abuse, but did not specifically mention that the defendant threatened her.

The trial court conducted a pretrial hearing regarding the records. At the hearing, the court stated that the Defendant had requested the records and that they had been filed under seal but that the court had not reviewed them. The prosecutor stated that he reviewed the DCS records and provided all of the information the State was required to disclose in the State's Brady disclosure. The court ruled that it would not review the DCS records. It noted that the State had complied with its duty to provide Brady material. The sealed records have not been provided to this court.

The State argues on appeal that the Defendant waived consideration of the issue by failing to raise it in the motion for a new trial. The motion for a new trial and amended motion for a new trial both contain an allegation of trial court error in failing to review the victim's "juvenile records." The State argues that the Defendant failed to challenge the court's specific ruling that it would not conduct an *in camera* review of the victim's DCS records and notes that the court distinguished the victim's juvenile court records from her DCS records. Although ambiguous, we believe the term "juvenile records" was sufficient to preserve the issue as to the DCS records.[2]

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Accordingly, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or lack thereof or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963). The Defendant does not allege that the State failed to comply with its Brady obligation. Rather, she alleges that upon request, the trial court had an obligation to review the DCS file for impeachment evidence. She cites Pennsylvania v. Ritchie, 480 U.S. 39 (1987), and State v. Doyle Winslow Smith, No. E2006-02642-CCA-R3-CD (Tenn. Crim. App. Dec. 19, 2008).

---

[2] The Defendant has not raised an appellate issue regarding the juvenile court records.

The record reflects that the Defendant received a pretrial Brady disclosure from the State, which the prosecutor indicated was based upon his review of the DCS records. Despite having received the Brady information, the Defendant sought an independent, pretrial review of the records by the trial court. The Defendant took the position that notwithstanding the State's Brady disclosure, the court should review the records for potential impeachment evidence relative to the victim.

This issue implicates two components of a defendant's constitutional guarantees. As we have stated, the defendant has a right to disclosure of exculpatory evidence that is material to guilt or punishment. Brady, 373 U.S. at 87. The right to receive Brady material is the constitutional component of a defendant's right to pretrial discovery. See also Tenn. R. Crim. P. 16 (defining the State's statutory duty to disclose evidence to the defense). Second, the Confrontation Clause affords the Defendant the rights to confront and cross-examine the witnesses at the trial. U.S. Const. Amends. VI, XIV; Tenn. Const. art. 1, § 9; see, e.g., State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996); State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 306 (Tenn. 2002).

The issue in this case is whether the trial court has an obligation to conduct an *in camera* review of confidential materials and provide the defense with evidence that could be used to impeach the victim after the State has already provided Brady disclosures from the same confidential materials. The State's Brady obligation extends to "evidence deemed to be exculpatory in nature and *evidence that could be used to impeach the state's witnesses*." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001) (emphasis added). In theory, the State's compliance with Brady would provide the Defendant with the same information for which the trial court was asked to conduct the *in camera* review.

The Defendant relies on Ritchie, in which the defendant was charged with sexual abuse of his daughter and subpoenaed the Pennsylvania Children and Youth Services' (CYS) records relative to the charges and earlier records from an alleged abuse of the defendant's children. CYS refused to comply with the subpoena based upon a statutory privilege, although the statute permitted disclosure of CYS's records to a "court of competent jurisdiction pursuant to a court order." The trial court did not examine the records and declined to order disclosure. A five-member majority of the Court analyzed the defendant's claim, instead, under a due process framework.[3] Id. at 56. The Court noted the prosecution's

_____

[3] Justice Blackmun parted ways with the remainder of the majority, now a plurality on this point, on the issue of whether the Confrontation Clause may be violated by limiting a defendant's *pretrial* access to information that might be used for cross-examination of a prosecution witness. Ritchie, 480 U.S. at 61-62 (Blackmun, J., concurring in part). Justices Brennan and Marshall agreed with Justice Blackmun on this

obligation to provide a criminal defendant with evidence in its possession that is favorable to the defendant and material to guilt or punishment. Id. at 57. It noted the public interest in maintaining confidentiality of sensitive information but likewise noted that the Pennsylvania statute permitted disclosure of the information in CYS records in some circumstances, including by court order. Id. The Court said that in the absence of apparent state policy otherwise, it could not conclude that the information would not be disclosed if a trial court determined that it was "material" to the defense. Id. at 58. The Court held that the court must review the CYS records and determine whether they contained information that probably would have changed the outcome of the defendant's trial, and if so, grant a new trial. Id.

As the Defendant notes in her brief, this court considered a trial court's denial of a defendant's request for an *in camera* review of a child rape victim's DCS records in Doyle Winslow Smith. Before the trial, the defendant filed a discovery request seeking exculpatory information, specifically impeachment evidence. The Stated filed a motion *in limine* seeking to prevent the defense from impeaching the victim regarding juvenile adjudications. The victim's DCS records were subpoenaed, but DCS moved to quash the subpoena. The Defendant then filed a motion for *in camera* review of the records by the trial court. During the hearing on the motion, the defense stated that it was told by the prosecution that the victim had been under juvenile court supervision at one time and that the defense wanted to know if the victim had been adjudicated delinquent for theft, which would provide impeachment evidence. The prosecutor advised the court, "[T]hat is not the situation here, Your Honor." The court denied the motion for *in camera* review of the records on the basis that Ritchie required a defendant to be specific about the information sought but that the defendant had not been sufficiently specific to warrant an *in camera* review. At the beginning of the trial, the prosecutor advised the court that the victim did not have a juvenile record but that she was living with a foster family. At the hearing on the motion for a new trial, the defendant presented evidence that the victim had a juvenile adjudication for joyriding and that there were DCS records regarding the victim's two prior reports of alleged physical abuse. This court stated that the trial court "appears to have abused its discretion in declining to review the records *in camera* following the defendant's request." Doyle Winslow Smith, slip op. at 9. The court concluded that the State violated Brady by denying the defense access to the victim's juvenile record. Id. The court noted the State's agreement with the defendant's claim that the allegations of prior abuse would have been admissible as the victim's prior statements, but it did not specifically address the State's failure to disclose the allegations of prior abuse as a Brady violation. Id., slip op. at 10.

---

point. Id. at 66 (Brennan, J. dissenting). The plurality said, though, "The ability to question adverse witnesses . . . does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." Id. at 53.

We acknowledge that other decisions of this court have said that due to the statutorily imposed confidentiality of child sexual abuse investigations, a criminal defendant has no right to discover them. See, e.g., State v. Biggs, 218 S.W.3d 643, 662 (Tenn. Crim. App. 2006); State v. Gibson, 973 S.W.2d 231, 244 (Tenn. Crim. App. 1998); State v. Timothy Joseph Simpson, No. E2005-02364-CCA-R3-CD (Tenn. Crim. App. Jan. 19, 2007) (citing Gibson), perm. app. denied (Tenn. May 21, 2007). We note, though, that these cases did not consider the issue in light of Ritchie, and we do not consider them authoritative.

Ritchie compels us to conclude that the overriding concern is protection of a defendant's confrontation rights at the trial. In the present case, the Defendant received Brady disclosures but nevertheless asked the trial court to review the records. While the Brady disclosure provided a mechanism to protect the Defendant's pretrial discovery rights, the majority's holding in Ritchie provides an additional mechanism for protecting a defendant's confrontation rights via *in camera* review of statutorily protected records.

Despite our conclusion that the trial court erred in declining to review the records, the Defendant is not entitled to relief unless the DCS records contained information that probably would have changed the outcome of the Defendant's trial. See Ritchie, 480 U.S. at 58. We note that the records in question were sealed and filed with the court, but they have not been included in the appellate record. In any event, we note the strong evidence of the Defendant's guilt, as demonstrated through her own statements regarding a romantic, sexual relationship with the minor victim. Even if the DCS records contained evidence that could be used to impeach the victim, the Defendant cannot overcome the other evidence of her admissions of guilt. We conclude that the court's failure to review the DCS records is harmless beyond a reasonable doubt. The Defendant is not entitled to relief on this basis.

**V**

The Defendant contends that the trial court erred in imposing consecutive sentences. The State counters that the court properly imposed consecutive sentences because the Defendant was convicted of two or more offenses of sexual abuse of a minor. See T.C.A. § 40-35-115(b)(5) (2010).

At the sentencing hearing, the parties did not offer any testimony, and the trial court reviewed the presentence report and letters written on the Defendant's behalf. The court noted it considered the trial evidence, the arguments of counsel, the presentence report, the principles of sentencing, the nature and characteristics of the Defendant's criminal conduct, and the statutory mitigating and enhancement factors. The court sentenced the Defendant to twenty-five years for each count. The court imposed the sentences for counts one, two, and three concurrently with each other and consecutively to the sentences for counts four and

five. The sentence for count four was consecutive to the sentence for count five. The effective sentence was seventy-five years. As we have noted, the trial court later filed judgments that reflect twenty-year sentences and an effective sentence of sixty years. See T.C.A. § 40-35-210(c) (2003) (amended 2005); Blakely, 542 U.S. at 305; Cunningham, 549 U.S. at 290. Neither the Defendant not the State challenges the length of the individual sentences on appeal.

In imposing consecutive sentences, the court noted the Defendant's position of trust as "essentially almost . . . a surrogate parent" to the victim, the length of time over which the crimes occurred, the nature of the sexual acts involved and the physical pain it caused the victim, and the residual physical and mental damage to the victim as a result of the crimes. The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Only one criterion is needed to support consecutive sentences. State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

The record reflects that the Defendant sexually abused the victim at least once per week for several months when the victim's mother was away from home. The Defendant acted as a second mother to the victim. After the abuse began, the victim developed eating disorders and began cutting herself. The victim said the Defendant made her feel like she had betrayed her mother. The Defendant convinced the victim that the victim's mother was keeping the victim from having a good life and alienated the victim from the victim's mother. After the victim and her mother moved from the Defendant's home, the Defendant continued to pursue the victim. The record reflects that the trial court considered the factors listed in section 40-35-115(b)(5) and concluded that the aggravating circumstances of the relationship, time span of the undetected sexual activity, nature and scope of the acts, and residual harm to the victim warranted consecutive sentencing. The evidence supports the trial court's ruling. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

                     _____
                     JOSEPH M. TIPTON, PRESIDING JUDGE